UNION ELECTRIC COMPANY,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

No. 74–1614.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1975.

Decided March 27, 1975.

208

William H. Ferrell, St. Louis, Mo., for petitioner.

Thomas A. Pursley, III, Atty., Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for respondent.

Walter W. Nowotny, Jefferson City, Mo., for intervenor, State of Mo.

Before GIBSON, Chief Judge, HEANEY and ROSS, Circuit Judges.

GIBSON, Chief Judge.

Petitioner, Union Electric Company, asserts that because of cost factors it is impossible or in the alternative that it is

manifestly against public interest for it to comply with emission control standards contained in the Missouri implementation plan approved by the Administrator of the Environmental Protection Agency (EPA), the Respondent herein. In this vital area of public power, Union Electric seeks relief from compliance with these standards by this original proceeding filed in this court pursuant to § 307(b)(1) of the Clean Air Act Amendments of 1970. This section allows consideration of a petition for review filed more than 30 days after the Administrator's approval or promulgation of a state implementation plan if such petition "is based solely on grounds arising after such 30th day."[1] While there have been many petitions filed challenging implementation plans within 30 days of the Administrator's approval,[2] so far as we know this is the first petition for review filed pursuant to § 307(b) after the initial 30 day period.[3]

At the outset we are confronted with the critical question of what are we to review. None of the contentions of the Petitioner have been presented to the Administrator nor have they been presented to the Missouri Air Conservation Commission for possible action, except in the limited manner discussed herein. We realize we are treading uncharted waters, and though sympathetic with the economic, technological and legal problems confronting the Petitioner, we hold for the reasons hereafter set forth that we lack jurisdiction to consider the issues raised in the petition for review.

*Background of This Litigation*

The Administrator approved the Missouri implementation plan pursuant to § 110 of the 1970 Amendments[4] on May 31, 1972.[5] A portion of the approved implementation plan, Regulation X, § B, restricts the emission of sulfur dioxide into the ambient air. Union Electric Company operates three coal-burning electric power generating plants in the Greater St. Louis area that are subject to the sulfur dioxide restrictions contained in the Missouri implementation plan. It alleges that it cannot comply with these restrictions, short of shutting down the plants, an event which, in the Petitioner's words, would "result in an immediate cessation of civilized life as we know it."[6]

Petitioner has variance applications pending in various stages of the adminis-

---

1. Section 307(b)(1), 42 U.S.C. § 1857h–5(b)(1) (1970), provides as pertinent herein:

 A petition for review of the Administrator's action in approving or promulgating any implementation plan * * * may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day.

2. *See, e.g.,* Texas v. E. P. A., 499 F.2d 289 (5th Cir. 1974) (a consolidation of 25 separate petitions for review).

3. The Ninth Circuit in Kawasaki Motors Corp. v. Train, No. 74–1697 (August 9, 1974), cert. denied, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975), an unreported order, granted the Administrator's motion to dismiss a petition for review of motorcycle use ban controls filed more·than 30 days after their promulgation on the grounds that it lacked jurisdiction. Whether the petition for review in that case was untimely filed, or alleged grounds arising solely after the 30th day, is not disclosed in the report.

4. 42 U.S.C. § 1857c–5 (1970).

5. 37 Fed.Reg. 10875 (1972). *See also* 40 C.F.R. § 52.1320 et seq. (1974).

6. Petitioner alleges that compliance with the sulfur dioxide emission standards is at this time impossible because removal equipment has not been technologically devised to operate successfully or satisfactorily, noting that such equipment has been installed at its Meramec plant and found to be unreliable and unsatisfactory. It further asserts that the cost of this unsatisfactory equipment for all of its plants would be $500 million and that the difficulty of raising that amount with regulatory bodies having to approve the issuance of bonds and the public market accepting the bonds is now insurmountable, even with vastly increased rates. In the alternative, it contends that the cost is so high in relation to the benefits that the public interest would be adversely affected.

trative process in the State of Missouri.[7] However, while awaiting state decisions, Union Electric was notified on May 31, 1974, by the Administrator that its plants were in violation of the sulfur dioxide emission regulations. The present petition was filed August 18, 1974, requesting that we review that portion of the Missouri implementation plan approved by the Administrator which limits sulfur dioxide emissions. Our jurisdiction depends upon whether the grounds that Union Electric asserts in its petition for review arise solely after the initial 30 day period for seeking review.[8] The Respondent and Intervenors, State of Missouri and the Missouri Air Conservation Commission, have filed motions to dismiss the petition, contending that we lack jurisdiction.

### The Statute

The Clean Air Act Amendments of 1970 were intended, as the preamble sets out, "to provide for a more effective program to improve the quality of the Nation's air." To accomplish this the Amendments set a timetable for reducing the pollution of the ambient air[9] to at least national standards set to assure the public health and welfare. National primary ambient air standards are set by the Administrator at levels he determines are requisite to protect the public health[10] and are required to be met within three years from the approval of a state implementation plan.[11] National secondary ambient air standards specify a level of air quality requisite to protect the public welfare[12] from known or anticipated adverse effects,[13] and are to be attained within a reasonable time.[14]

The scheme of the Amendments provides for strict federal oversight of state action to reach the mandated air quality goals. This interaction was summarized in Natural Resources Defense Council, Inc. v. E. P. A., 483 F.2d 690, 691–92 (8th Cir. 1973):[15]

---

7. Missouri's Air Conservation Law, setting forth the powers and duties of the Missouri Air Conservation Commission, an intervenor herein, is located in Mo.Rev.Stat. § 203.010 et seq. (1969). Variance procedures are contained in § 203.110. A variance for the Meramec plant was denied by the St. Louis County Air Pollution Control Director and has been appealed to the St. Louis County Air Pollution Control Appeal Board. A variance for the Sioux plant expired on July 24, 1974, and Petitioner has requested an extension. No state action on a requested variance for the Labadie plant had been taken at the time of oral argument on this petition.

8. The grounds in the petition alleged to arise solely after the initial 30 day period for seeking review are:

(1) The Arabian Oil Embargo and related economic factors resulting in a shortage of low sulfur coal and/or the high cost of obtaining it would be against the public interest;

(2) Sulfur dioxide removal equipment has not been developed;

(3) The price of sulfur dioxide removal equipment has increased to where its installation would cost in excess of $500 million;

(4) The impossibility of obtaining financing to purchase and install sulfur dioxide removal equipment;

(5) Sulfur dioxide has been shown not to be the medical hazard thought at the time of the promulgation of standards; and

(6) That compliance with Regulation S–X is not necessary to attain the national primary ambient air standards in the St. Louis metropolitan area.

9. Ambient air has been defined by federal regulation to mean that portion of the atmosphere external to buildings to which the general public has access. 36 Fed.Reg. 22384 (1971).

10. Sec. 109(b)(1), 42 U.S.C. § 1857c–4(b)(1) (1970).

11. Sec. 110(a)(2)(A)(i), 42 U.S.C. § 1857c–5(a)(2)(A)(i) (1970).

12. Welfare standards are to be established with reference to the "effects on soils, water, vegetation, man-made materials, animals, wildlife, visibility, climate, and economic values." S.Rep. No. 1196, 91st Cong., 2d Sess. 11 (1970) [hereinafter cited as Senate Report].

13. Sec. 109(b)(2), 42 U.S.C. § 1857c–4(b)(2) (1970).

14. Sec. 110(a)(2)(A)(ii), 42 U.S.C. § 1857c–5(a)(2)(A)(ii) (1970). Standards have been issued for carbon monoxide, hydrocarbons, photochemical oxidants, sulfur oxides, nitrogen dioxide and particulate matter. 36 Fed.Reg. 22384 (1971).

15. For an extended discussion of the federal-state cooperation intended by the Amendments, see Luneburg, Federal-State Interaction Under the Clean Air Amendments of 1970, 14 B.C.Ind. & Com.L.Rev. 637 (1973).

The 1970 Amendments require each state to submit to the Administrator a plan for implementation, maintenance, and enforcement of the federal standards * * *. The plan must be designed to achieve *primary* standards as expeditiously as practicable, but in no case later than three years from the date of approval of such plan, and *secondary* standards within a reasonable time * * *. The Administrator is to approve or disapprove each portion of the plan depending on whether it conforms with the prescribed deadlines for attainment of national standards and with other criteria set out in § 1857c–5(a)(2). If any plan or portion thereof fails to conform to statutory requirements, the Administrator ultimately is directed to promulgate such regulations as may be necessary to cure the deficiency[.] (emphasis in original, footnote omitted).

 Upon approval or promulgation of a state implementation plan, the requirements thereof have the force and effect of federal law and may be enforced by the Administrator in federal courts.[16] The state may enforce its regulations through state proceedings,[17] and citizens' suits in limited circumstances were provided as an additional method of enforcement by Section 304.[18]

*Jurisdiction*

 All the parties to this proceeding agree that if we have jurisdiction it must be by virtue of grounds solely arising after the 30 days from the Administrator's approval. This last phrase of § 307(b), unless we adopt a position that controverted allegations are sufficient to sustain jurisdiction, would require this court to engage in fact-finding as to whether the grounds arose solely after 30 days of approval to determine our jurisdiction. While the Courts of Appeals are not generally viewed as courts of original jurisdiction, we entertain no doubt but that Congress could, if it so chose, require that we engage in just such a fact-finding process, though our facilities for doing so are awkward and limited. Recognizing that the grounds it posits for review would require such a course, Union Electric contends that this was the intention of Congress and that we have inherent power to appoint a master to assist our resolution of disputed factual issues.[19] However, as such a course would be so far removed from the normal method of operation of an appellate court[20] and § 307(b)(1) speaks in terms of "review," we believe such an intention on the part of Congress should be manifestly clear before we undertake the course suggested by Petitioner.

Respondent EPA and the Intervenors argue, *inter alia*, that the grounds Union

---

**16.** 42 U.S.C. § 1857c–8 (Supp. I, 1971), amending 42 U.S.C. § 1857c–8 (1970). A civil action for appropriate relief, including temporary or permanent injunction may be brought. Criminal penalties of up to $25,000 per day or imprisonment for up to one year attach to knowing violations of a plan requirement or EPA order after expiration of a thirty day notice period.

**17.** It has been *suggested* that *states could* avail themselves of the citizen suit provisions of § 304 to obtain injunctive relief in the federal district courts. Luneburg, Federal-State Interaction Under the Clean Air Amendments of 1970, 14 B.C.Ind. & Com.L.Rev. 637, 662–64 (1973).

**18.** 42 U.S.C. § 1857h–2 (1970).

**19.** Such a power appears inherent and might also arise from Fed.R.Civ.P. Rule 53(a). We

have in at least one instance, not arising under the statute in question, followed such a course. N. L. R. B. v. Clinton Packing Co., No. 20,341 (8th Cir. Feb. 12, 1974). *See also* N. L. R. B. v. Teamsters Local 282, 438 F.2d 100 (2d Cir. 1970); N. L. R. B. v. Remington Rand, Inc., 130 F.2d 919, 925–26 (2d Cir. 1942).

**20.** *See* South Terminal Corp. v. E. P. A., 504 F.2d 646, 665 (1st Cir. 1974):

The normal way courts evaluate a technical issue is through proceedings attended by expert witnesses. Yet as an appellate court, we cannot conduct such fact-finding proceedings on our own. Congress has not interposed a district court in the chain of review, so we cannot remand for clarifying findings of fact based, perhaps, on testimony by Agency and private experts.

Electric asserts as a basis for review do not arise "solely" after the 30 day period. Yet, in passing upon the motions to dismiss, we hesitate to rest our decision on that basis, for to do so would require us to engage in just that fact-finding process we are unsure was contemplated by Congress. We will thus assume for the determination of the question of our jurisdiction that Union Electric's grounds for review do in fact arise solely after the initial 30 day period for review.

There is a certain measure of ambiguity in § 307(b)(1). The section speaks in terms of a petition for review, not an original proceeding. If we accept Union Electric's argument, there would be no record to review. EPA, the Intervenors, and amicus, Coalition for the Environment, assert that questions of economic and technological feasibility do not constitute grounds for review as that term is used in § 307. This position provides a compelling basis for rejection of several

of the grounds asserted by Union Electric. However, as the potential grounds for review are not set out in the statute, we must look to the legislative history to determine whether this argument has merit.[21] Before consideration of the legislative history, it is necessary at this point to look to what the Administrator is required to do by statute, as it is his actions that we must review, and to establish what the standard of review of his action is under § 307(b)(1).

*Duties of the Administrator*

■ Our review under § 307 is only of the Administrator's action in approving or promulgating a state implementation plan. In determining whether to approve or disapprove a state implementation plan, the Administrator's discretion is limited by the clear terms of the Act. He *shall* approve any state implementation plan which meets the requirements of § 110(a)(2).[22] In addition, the

---

**21.** We do so in recognition that:

Unlike mathematical symbols, the phrasing of such social legislation as this seldom attains more than approximate precision of definition. That is why all relevant aids are summoned to determine meaning. Of compelling consideration is the fact that words acquire scope and function from the history of events which they summarize.

Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 185–86, 61 S.Ct. 845, 848, 85 L.Ed. 1271 (1941).

**22.** Section 110(a)(2), 42 U.S.C. § 1857c–5(a)(2) (1970) provides:

The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

(A)(1) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but * * * in no case later than three years from the date of approval of such plan * * * and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls;

(C) it includes provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and, (ii) upon request, make such data available to the Administrator;

(D) it includes a procedure, meeting the requirements of paragraph (4), for review (prior to construction or modification) of the location of new sources to which a standard of performance will apply;

(E) it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region;

(F) it provides (i) necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan, (ii) requirements for installation of equipment by owners or operators of stationary sources to monitor emis-

fact that States may adopt and enforce emission standards and control strategies even more stringent than the federal[23] serves to further limit the discretionary area of his authority to approve or disapprove an implementation plan.

The Administrator argues that as he cannot consider economic and technological feasibility in approving or disapproving implementation plans, Congress could not have intended to allow these questions to be raised in a petition for review. In a similar vein, the Coalition for the Environment asserts that we are limited in our review to those matters which, had they been in existence and known to the Administrator at the time of his approval or promulgation of the implementation plan, would have prevented him from giving his approval.

Petitioner disputes the above contentions for two reasons. First, it argues that there is no more important consideration than an economic one that makes it impossible or manifestly against the public interest for it to comply with the regulations, and secondly, that grounds for review after the initial 30 day period exist whenever any "significant new information" affecting the Petitioner becomes available. Before attempting an answer to the above contentions we look first to our scope of review.

*Scope of Review Under § 307*

While many provisions of the Clean Air Act Amendments of 1970 were subjected to vigorous debate and disagreement in Congress, very little was said about judicial review. In the report accompanying the conference agreement, it is merely noted that the conference substitute "specifies the courts in which certain appeals may be prosecuted."[24] A Senate summary of the conference agreement recited that "[t]he agreement permits review of the standards, implementation plans, or other action taken pursuant to the Act."[25]

sions from such sources, (iii) for periodic reports on the nature and amounts of such emissions; (iv) that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection; and (v) for authority comparable to that in section 1857h-1 of this chapter, and adequate contingency plans to implement such authority;

(G) it provides, to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards; and

(H) it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements.

23. Section 116, 42 U.S.C. § 1857d–1 (1970), provides:
　　Retention of State authority.
　　Except as otherwise provided in * * * this title (preempting certain State regula-

tion of moving sources) nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan * * * such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.
*See also Senate Report, supra* note 12, at 10; Letter from Russell Train, Administrator of the EPA to Honorable Carl Albert, Speaker of the House, in 2 U.S.Code Cong. & Admin.News 3299 (1974):
　　Neither the current program nor the proposed amendment would infringe on the important principle that States have the prerogative to adopt and enforce more stringent controls if they choose to do so.

24. H.R.Conf.Rep. No. 1783, 91st Cong., 2d Sess. (1970), reprinted in U.S.Code Cong. & Admin.News 5374, 5389 (1970) [hereinafter cited as *Conference Report* ].

25. 116 Cong.Rec. 20,600 (daily ed. Dec. 18, 1970).

■ We think that our review of the Administrator's action in approving or disapproving an implementation plan is a narrow one, in which:

> [We] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citations omitted).

The one principle in the decided Clean Air Act cases upon which all the circuits have agreed is that review is limited to determining whether the Administrator's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [26] *See* Natural Resources Defense Council, Inc. v. E. P. A., 507 F.2d 905 (9th Cir. 1974); South Terminal Corp. v. E. P. A., 504 F.2d 646, 655–56 (1st Cir. 1974); Texas v. E. P. A., 499 F.2d 289, 296–97 (5th Cir. 1974); Buckeye Power, Inc. v. E. P. A., 481 F.2d 162, 170–71 (6th Cir. 1973); Delaware Citizens for Clean Air, Inc. v. E. P. A., 480 F.2d 972, 975–76 (3d Cir. 1973); Appalachian Power Co. v. E. P. A., 477 F.2d 495, 505–07 (4th Cir. 1973).

Before an intelligent determination of whether the Administrator's action represents a clear error of judgment could be made, it is necessary to know what the relevant factors are that the Administrator must consider in approving or promulgating an implementation plan.

If Congress did not consider economic or technological considerations to be relevant to the Administrator's approval, even should significant new information relating to these considerations arise solely after the 30th day, they would not properly be considered upon a petition for review of the Administrator's action. As we earlier noted, the statute itself provides limited guidance.[27] However, we are mindful that:

> Statutes * * * are not inert exercises in literary composition. They are instruments of government, and in construing them "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. Statutory meaning, it is to be remembered, is more to be felt than demonstrated, or, as Judge Learned Hand has put it, the art of interpretation is "the art of proliferation a purpose."

United States v. Shirey, 359 U.S. 255, 260–61, 79 S.Ct. 746, 749, 3 L.Ed.2d 789 (1958) (citations omitted).

The legislative history of the amendments does provide an insight into the intent of Congress and what factors it was concerned with in enacting a review provision.

*Legislative History of § 307*

A bill to amend the Clean Air Act of 1967 passed the House in June, 1970. Included in several sections of that bill, including Sec. 108(c)(4) dealing with enforcement and judicial review,[28] was language indicating that the economic and

---

**26.** 5 U.S.C. § 706(2)(A) (1970); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

**27.** *See* Section 111(a)(1), 42 U.S.C. § 1857c–6(a)(1) (Supp. I, 1971), *amending* 42 U.S.C. § 1857c–6(a)(1) (1970). This is the only section of the 1970 Amendments that indicates that the Administrator is to take into account cost considerations, and it applies only to the

issuance of standards of performance for *new* sources. Inferentially, if cost considerations were to be taken into account in approving implementation plans, such an intention would be expressed in the statute.

**28.** *See* H.R.Rep. No. 1146, 91st Cong., 2d Sess (1970), *reprinted in* U.S.Code Cong. & Admin. News 5356, 5364 (1970).

technological feasibility of compliance was to be a consideration under the Act. The Senate bill was passed in September, 1970, and came after smog blanketed the east coast of the country in July. The timing of that smog attack was reflected in the stricter provisions of the Senate bill, which except for new source performance standards, included no language that would indicate a concern for economic or technological feasibility. To the contrary, the *Senate Report, supra* note 12 at 2–3, states:

> In the Committee discussions, considerable concern was expressed regarding the use of the concept of technical feasibility as the basis of ambient air standards. The Committee determined that 1) the health of people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and 2) the growth of pollution load in

many areas, even with the application of available technology, would still be deleterious to public health.

Therefore, the Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down, and in addition that new sources should be controlled to the maximum extent possible to prevent atmospheric emissions.

That this was the deliberate intention of the Senate sponsors was manifested during the floor debates.[29] The final form of the bill passed by both houses was worked out in conference. Although the conference agreement was technically a House bill, it is clear that the stronger Senate version prevailed in conference.[30]

▮ It is clear that Congress intended to preclude economic and technological factors from the Administrator's consideration of whether to approve an implementation plan. Even if these grounds

---

29. *See* 116 Cong.Rec. 16,091–96 (*daily ed.* Sept. 21, 1970) (remarks of Senator Muskie):

These five sets of requirements will be difficult to meet. But the committee is convinced that industry can make compliance with them possible or impossible.

\* \* \* \* \* \*

It is not necessary to say that any company is going to be closed on January 1, 1975, but it is necessary for the Congress to say that they must meet the standards until the Congress itself decides otherwise. That is what we are asking. Five years is a long time for the companies to make their effort, then to make their case and then for Congress to consider a change of policy.

\* \* \* \* \* \*

The deadline is based not, I repeat, on economic and technical feasibility, but on considerations of public health. \* \* \* If the industry cannot meet it, they can come back.

\* \* \* \* \* \*

\* \* \* What we are talking about is very clear and simple. We are saying that Congress, in the interest of public health, should say to the country and to the industry that this is what the health requires. Then industry should go to work over the next 5 years to either make it possible or, if it proves to be impossible, ask Congress to change the policy.

30. *Conference Report, supra* note 24; 116 Cong.Rec. 20,597 (*daily ed.* Dec. 18, 1970) (remarks of Senator Muskie); 116 Cong.Rec. 12,-058–59 (*daily ed.* Dec. 18, 1970) (remarks of Representative Staggers); 116 Cong.Rec. 12,-063 (*daily ed.* Dec. 18, 1970) (remarks of Representative Vanik).

Although subsequently expressed intention is not necessarily a reliable guide to Congressional intent at the time of passage, the following statement of Senator Eagleton, a Senate conferee on the 1970 Amendments, is instructive as to the conference agreement:

On this question of an economic factor, I am as positive about this as a mortal can be, that was specifically written out of the bill because many hours were spent in conference debating the economic feasibility factor and the House had such language in the bill as:

"Giving due consideration to economic and technological feasibility of compliance."

That appeared in more than one place in the House bill and it was stricken from the bill in conference to go back to the Senate version which had no economic factor as far as protection of public health was concerned.

Hearings on Implementation of the Clean Air Act Amendments of 1970 Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works, 92d Cong., 2d Sess., pt. 1 at 21 (1972) [hereinafter cited as *1972 Subcomm. Hearings*].

are considered by the Administrator, the mandatory and directory language of § 110(a)(2) would preclude using such grounds ·as a basis for setting aside his action on a petition for review under § 307(b)(1).

█ The *Senate Report, supra,* note 12. at 36, states that "[t]hese matters [technological or other considerations] would have been settled in the administrative procedure leading to an implementation plan or emission control provision." Reference to the "administrative procedure" is revealing. State action on adopting an implementation plan can only be taken after public hearings held upon reasonable notice. Congress left it to the States to determine economic and technological questions so long as the state's plan would attain the national standards. The Administrator's determination to approve or reject the state plan is to be made, not on what might be called the legislative decisions made by the States, but on whether the means adopted by the implementation plan are sufficient to assure that the national standards will be met within the mandated timetable.

As each State was free, within the federal standards, to adopt its own plan for meeting the challenge of reducing air pollution, it is appropriate that the making of decisions as to what would be required in terms of economic cost and technological innovation were left to the States.[31] These decisions were left by the Congress to the States and are not to be reviewed by means of a § 307 petition.

### Cases Arising Under § 307

█ While this is a case of first impression, we must reject Petitioner's contention that cases dealing with petitions for review filed within 30 days have only a collateral interest. We are convinced that only matters which, if known to the Administrator at the time of his action, would justify setting aside that action are properly reviewable after the initial 30 day review period. We must admit that the prior case law is not entirely consistent with our conclusion.

Petitioner's contention that economic and technological factors can be asserted in a petition for review is not without support. In Buckeye Power, Inc. v. E. P. A., 481 F.2d 162 (6th Cir. 1973), the court found EPA's argument that technological infeasibility, high cost-benefit ratios, and resource availability are irrelevant

---

**31.** See Requirements for Preparation, Adoption, and Submittal of Implementation Plans [hereinafter cited as *EPA Guidelines*], 40 C.F.R. § 51.2 (1972):

> Nothing in this part shall be construed in any manner:
>
> \* \* \* \* \* \*
>
> (d) To encourage a State to prepare, adopt, or submit a plan without taking into consideration the social and economic impact of the control strategy set forth in such plan, including, but not limited to, impact on availability of fuels, energy, transportation, and employment.

This portion of the EPA Guidelines was subjected to intensive scrutiny in the *1972 Subcomm. Hearings, supra* note 30 at 18–23, 276–77, 307–08, 312–13. It has also been criticized as being an inappropriate concern in light of the expressed Congressional unwillingness to sacrifice the public health and welfare to economic exigencies. Note, Clean Air Act Amendments of 1970: A Congressional Cosmetic, 61 Geo.L.J. 153, 179–80 (1972).

Such a criticism seems unwarranted in view of the Congressional recognition that economic decisions would be left to and required of the States. *See* 116 Cong.Rec. 16,107 (daily ed. Sept. 21, 1970) (remarks of Senator Cooper):

> And these [state implementation] plans must accomplish the air quality standards within 3 years. It is at this point that States and communities must make economic decisions, and decisions on the future growth of their areas and the kind of life they want, in considering alternative means of achieving clean air.

*See also,* South Terminal Corp. v. E. P. A., 504 F.2d 646, 676 n. 33 (1st Cir. 1974); 1972 Subcomm. Hearings, *supra* note 30, at 312 (Memorandum of Ass't General Counsel of EPA):

> It was expected that, at the [state] hearings, persons responsible for adoption of the plan would be made aware of the feasibility and impact of various possible strategies on all segments of the public. To expect States to evaluate the impact of various alternatives open to them without considering the economic and social impact of their decisions would deprive them of the flexibility and initiative Congress intended that they retain.

under the 1970 Amendments devoid of merit. That decision was premised in part, however, on the legislative history of the House bill, giving little weight to the Senate pronouncements that such considerations were irrelevant. As we have previously indicated, it was the stricter Senate version that was adopted, although carrying the label of the House bill. Moreover, the court in *Buckeye Power* went on to hold that review of ·petitioners' claims of economic and technological infeasibility of compliance could not be obtained in a § 307(b)(1) review proceeding, but would be available as defenses in federal or state enforcement proceedings.

More favorable to Union Electric is the decision in Appalachian Power Co. v. E. P. A., 477 F.2d 495 (4th Cir. 1973). Therein, the Fourth Circuit indicated that an evaluation by the Administrator of the economic and technological feasibility of state implementation plans is appropriate since ·he must determine whether the proposed plan is practicable and reasonably likely to achieve the results required under the Amendments. As the court is to engage in a "substantial inquiry" into the reasonableness of agency action, such a review would apparently extend to determining whether the Administrator's approval of a plan challenged as economically or technically unreasonable was based upon consideration of all relevant factors, including economic or technical ones.

In Duquesne Light Co. v. E. P. A., 481 F.2d 1 (3d Cir. 1973), the court faced a timely challenge to the Administrator's approval of Pennsylvania's implementation plan on the ground of its unreason-

able requirements. The companies involved therein were also pursuing state variance procedures, the course advocated by the EPA in the present case.[32] Without determining whether the Administrator's approval was reasonable, the court did afford a measure of relief. It held that the EPA must either (1) refrain from imposing penalties during the pendency of the state administrative procedures or (2) grant the companies a limited *legislative* hearing in which the companies could· attack the economic or technical infeasibility of the implementation plan.[33] The Third Circuit also held in a pre-enforcement challenge not brought pursuant to § 307(b)(1) that questions of economic hardship or lack of compelling necessity should have been raised in a § 307(b) proceeding. Getty Oil Co. v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

*Getty Oil* is instructive as it illuminates, in part, the dilemma faced by Petitioner. Getty did not challenge the Administrator's approval of the Delaware implementation plan in a § 307(b) proceeding, but instead sought an administrative variance from the State. When this was denied, Getty sought and obtained an injunction in state court against enforcement of the objectionable provisions of the state plan. Such an injunction did not bind the EPA, however, and the EPA commenced enforcement action based upon the provisions of the state plan unenforceable by the State. Getty sought relief in the federal courts and was denied upon the basis that the only remedy available to chal-

---

**32.** State variance procedures would afford little relief to Union Electric in the present case as we have held that after the federal compliance date for attainment of national primary standards (June 1, 1975, for the St. Louis area), 37 Fed.Reg. 10876–77 (1971), variances may not be granted. Natural Resources Defense Council, Inc. v. E. P. A., 483 F.2d 690 (8th Cir. 1973). *Accord,* Natural Resources Defense Council, Inc. v. E. P. A., 478 F.2d 875 (1st Cir. 1973); *see* Natural Resources Defense Council, Inc. v. E. P. A., 489 F.2d 390, 401–03 (5th Cir. 1974) (only remedy is a postpone-

ment of standards by application of Governor). *But see* Natural Resources Defense Council, Inc. v. E. P. A., 507 F.2d 905 (9th Cir. 1974) (minor variances may be granted in both pre- and post-attainment stages).

**33.** Recognizing as it did so that it was "operating on the frontiers of legal thought, and any advance post that we take up is liable to the dangers of heavy ground assault. But it is only by such expeditions that knowledge of the terrain ahead may be gained." *Duquesne Light Co., supra* 481 F.2d at 10–11 n. 49.

lenge the approved implementation plan was § 307(b)(1).

In *Getty Oil* economic hardship was viewed as a ground to support a petition for review. However, as we have previously indicated, we do not think this question is one reviewable in a § 307(b) proceeding. Our reading of the statute finds support in the First, Fifth and Ninth Circuits. The First Circuit in South Terminal Corp. v. E. P. A., 504 F.2d 646, 675 (1st Cir. 1974), took the position that economic and social impacts of an implementation plan are not sufficient reasons to reject measures that would insure compliance with primary air quality standards.[34]

The Fifth Circuit was faced with a challenge to the technological feasibility of hydrocarbon emission regulations in Texas v. E. P. A., 499 F.2d 289 (5th Cir. 1974). In finding the petitioners' concerns not a basis for attack under § 307(b)(1), the court noted:

There is no basis whatever in the record for concluding that a compliance date of May 31, 1975 is technologically feasible, and it may well be that this requirement must be postponed. However, we do not believe that this fact makes the regulation arbitrary or capricious, for 42 U.S.C.A. § 1857c–5(f) contemplates plans which require control measures of less than certain technological feasibility. That section specifies procedures for obtaining a postponement of compliance dates for particular sources, and it is through those procedures that petitioners must seek relief.

Texas v. E. P. A., *supra* at 317.

The postponement procedure mentioned by the Fifth Circuit is that provided in § 110(f)(1)[35] wherein the Governor of the state to which the provisions of the implementation plan applies may request postponement of an emissions limitation for a period not to exceed one year.

The Ninth Circuit has also noted that questions of economic or technological feasibility are not concerns of the 1970 Amendments. *See* Natural Resources Defense Council, Inc. v. E. P. A., 507 F.2d 905, 914 (9th Cir. 1974):

[R]eferences in the reports and debates, clearly evince a legislative intent to realize national ambient air standards despite economic cost and in spite of the possibility that some business enterprises, unable to comply with a state's plan so as to enable that state to attain national standards

---

**34.** *South Terminal Corp.*, *supra* 504 F.2d at 675:

> The material portions of the Clean Air Act itself do not mention economic or social impact, and it seems plain that Congress intended the Administrator to enforce compliance with air quality standards even if the costs are great. Particularly in the case of primary standards—those set as "requisite to public health"—Congress' position is not extreme or unprecedented. Minimum public health requirements are often, perhaps usually, set without consideration of other economic impact. * * * Congress has already made a judgment the other way, and EPA and the courts are bound.

> *See also* Natural Resources Defense Council, Inc. v. E. P. A., 478 F.2d 875, 888–89 (1st Cir. 1973).

**35.** 42 U.S.C. § 1857c–5(f)(1) (1970). That section provides:

> Prior to the date on which any stationary source or class of moving sources is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the applicability of such requirement to such source (or class) for not more than one year. If the Administrator determines that—
> (A) good faith efforts have been made to comply with such requirement before such date,
> (B) such source (or class) is unable to comply with such requirement because the necessary technology or other alternative methods of control are not available or have not been available for a sufficient period of time,
> (C) any available alternative operating procedures and interim control measures have reduced or will reduce the impact of such source on public health, and
> (D) the continued operation of such source is essential to national security or to the public health or welfare,
> then the Administrator shall grant a postponement of such requirement.

within the prescribed time period, might have to terminate operations. (Footnote omitted.)

And lastly it should be noted that this court, in adopting the reasoning and remedy of the First Circuit in Natural Resources Defense Council, Inc. v. E. P. A., 478 F.2d 875 (1st Cir. 1973), in a challenge to the Iowa implementation plan approved the position that economic hardship is insufficient to support a state variance in the post-attainment period. Natural Resources Defense Council, Inc. v. E. P. A., 483 F.2d 690, 693–94 (8th Cir. 1973).

█ We conclude that economic and technological considerations do not afford a basis for our review under § 307(b); therefore, even if Grounds 1 through 4 alleged by Union Electric, *supra* note 8, could be shown to have arisen more than 30 days after the Administrator's approval of the Missouri implementation plan, they would not provide a basis for setting that approval aside.

While the considerations Petitioner asserts in its petition for review are important ones needing resolution, they are not appropriate for judicial resolution but are essentially legislative judgments as to where the public interest lies. Whether the public interest would be best served by closing plants or by allowing some variances from the national program for clean air we cannot say. This is, of course, a current concern of Petitioner as well as of almost all citizens in this country. However, the statement of this concern does not thereby render it into one capable of judicial resolution.

This is in essence a political question. The answer should be and, when the situation is grave enough, perhaps will be made in the legislative arena. It is not our role to sit as a super-legislature balancing the necessity of compliance with the clean air standards against competing economic and technological considerations.

We do not, however, read the provision for review in § 307(b) as a nullity.

Congress must have intended that some grounds arising after the initial 30-day period could provide grounds for review. The Senate Report at 41–42 in discussing the review provisions of § 307 stated:

The committee recognizes that it would not be in the public interest to measure for all time the adequacy of a promulgation of any standard or regulation by the information available at the time of such promulgation. In the area of protection of public health and environmental quality, it is clear that new information will be developed and that such information may dictate a revision or modification of any promulgated standard or regulation established under the act. The judicial review section, therefore, provides that any person may challenge any promulgated standard, regulation, or approved or promulgated implementation plan after the date of promulgation whenever it is alleged that significant new information has become available.

New information may become available at some future date which indicates that a particular pollution agent or combination of agents is hazardous to the health of persons and therefore should be added to those pollution agents subject to the provisions of section 115. Conversely, new information may become available indicating that a pollution agent for which a prohibition had been established under section 115 is not hazardous to the health of persons. If the [Administrator] fails to act in either event, the promulgation could be challenged.

█ We believe that the significant new information to which Congress referred must relate to the protection of the public health or environmental quality, not to new information relating to *technological innovation or lack thereof*, or to cost increases not foreseen at the time of the Administrator's approval of the implementation plan and thus not asserted in a petition for review within 30 days.

█ The theme of the 1970 Amendments is the protection of the public

health and welfare, notwithstanding the serious cost and technological obstacles. While information that indicates a certain pollutant is not a health hazard or is a greater one than originally thought is significant new information that Congress indicated should be considered and acted upon by the Administrator, no similar indication appears for matters of cost or technology. Our interpretation is also more consonant with the ordinary meaning of "review"—the term used in § 307—and would not require a fact-finding procedure at the appellate level. The Senate Report indicates that it is only when the Administrator fails to act upon the basis of the new information that review is proper under § 307, implying that the information would have to be brought to the Administrator's attention. The petition for review in this circumstance would be a challenge to the Administrator's action and would require a scrutiny of the administrative record available to the Administrator to determine whether a clear error of judgment had been shown. It would not require that this court in the first instance develop a record on the challenges. The aforegoing interpretation is consistent with the statutory scheme and preserves the provision in § 307 for review after 30 days without creating a nullity.

■■■■■ Ground No. 5 set forth in Union Electric's petition, see note 8, *supra,* alleges that sulfur dioxide is not the health hazard once thought. Under our interpretation of § 307 this ground would be sufficient to sustain a petition for review under § 307. This does not mean, however, that it is properly presented in the present petition. First, there is no indication that this objection has been brought to the Administrator's attention. It is only when the Administrator fails to act upon the basis of the new information presented to him that a petition for review is proper. Moréover, this challenge is to a national standard and as such must be filed in the District of Columbia Circuit.[36]

■■■■■ Although any national revision of a primary or secondary standard would require a corresponding revision in the Missouri implementation plan,[37] limited of course by the State's right to set standards even more stringent than the federal if it desires, we do not have jurisdiction over a challenge to the Administrator's action as it relates to national standards.

■■■■ The last ground posited to sustain jurisdiction is that information developed since June 30, 1972, has shown that Union Electric's compliance with the sulfur dioxide emission regulation is not necessary to attain national air quality standards in the St. Louis area. This contention does not furnish grounds for review of the Administrator's approval of the Missouri plan. As we have previously noted, the States are free to adopt limitations even stricter than the federal, and it cannot be contended that the States are limited in their implementation plans to doing no more than assuring that the national standards are to be met and maintained.[38] They may also be required to assure the nondegradation of air quality which exceeds the national standards.[39]

---

**36.** Section 307(b)(1), 42 U.S.C. § 1857h–5(b)(1) (1970), provides as pertinent:

A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard * * * may be filed only in the United States Court of Appeals for the District of Columbia.

**37.** Sec. 110(a)(2)(H), 42 U.S.C. § 1857c–5(a)(2)(H) (1970).

**38.** *See* H.R.Conf.Rep.No.1085, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.Code Cong. &

Admin.News 3302, 3313 (1974), re the Energy Supply and Environmental Coordination Act of 1974:

Moreover, enforcement of any such requirement [source emission regulation] should not be made contingent upon a showing that the national primary standard is being exceeded at any place or time. This is not required under the Clean Air Act, as amended in 1970; nor is it required here.

**39.** *See* Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), aff'd per curiam, No. 72–1528 (D.C.Cir. Nov. 1, 1972), aff'd by

We therefore hold that we are without jurisdiction to consider the claims raised by Union Electric in its petition for review. Accordingly, the motions to dismiss the petition filed by the EPA and Intervenors, State of Missouri and the Missouri Air Conservation Commission, will be granted.

Petition dismissed.

an equally divided court sub nom. Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d

140 (1973) (per curiam). *See also* 1972 Subcomm. Hearings, *supra* note 30 at 18, 20–21.